UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FELIX ROMAN,

                              Plaintiff,

            -against-                                          04 Civ. 4515 (RJH)

                                                              **<u>DECISION AND ORDER</u>**

JO ANNE BARNHART, Commissioner of Social
Security,

                              Defendant.

---

On or about May 11, 2004, plaintiff Felix Roman commenced this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. § 405(g) and § 1383(c)(3), seeking court review of an administrative law judge's ("ALJ") decision, dated September 23, 2003, to deny plaintiff's application for Social Security Disability Insurance benefits because of his finding that plaintiff was not disabled.  This became the final decision of the Commissioner of Social Security ("Commissioner") on March 10, 2004, when the Social Security Administration Appeals Council denied plaintiff's request for review.

On May 11, 2004, plaintiff filed a pro se complaint with this Court's pro se office.  On January 11, 2005, the Commissioner served her answer and a copy of the administrative record.  On April 22, 2005, the Commission moved for an order affirming her decision.  On May 31, 2005, attorney Christopher James Bowes from the Center for Disability Advocacy Rights, Inc. filed a motion for remand on plaintiff's behalf; his brief annexed three medical reports made after the Commissioner's final decision.  On June 14, 2005, the Commissioner filed a reply memorandum opposing remand.

On or about August 16, 2005, United States Magistrate Judge Douglas F. Eaton, to whom the matter had been referred, issued a thorough Report and Recommendation ("Report"), concluding, among other things, that "there is substantial evidence in the record to support the ALJ's findings," and recommending that this Court "grant the Commissioner's motion for judgment on the pleadings and deny plaintiff's motion for a remand." (Report at 20.)  The Report advised the parties that "[p]ursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy." (Report at 20.)  No objections have been received from the parties as of this date.  For the reasons set forth below, the Report is adopted in its entirety.

The district court adopts a Magistrate Judge's report and recommendation when no clear error appears on the face of the record.  *See Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985).  However, the court is required to make a *de novo* determination of those portions of a report to which objection is made, 28 U.S.C. § 636(b)(1)(C), by reviewing "the Report, the record, applicable legal authorities, along with Plaintiff's and Defendant's objections and replies."  *Badhan v. Lab. Corp. of Am.*, 234 F. Supp. 2d 313, 316 (S.D.N.Y. 2002).  The court may then accept, reject, or modify in whole or in part recommendations of the Magistrate Judge. *See Nelson*, 618 F. Supp. at 1189.  If a party fails to object to a report within 10 days of being served with the report, that party waives their right to object and appellate review of the district court's decision adopting the report, absent unusual circumstances, is precluded.  *See United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).

Because no objections were made to the Report, the court examined it only for clear error.  Having concluded that no such error appears on the face of the record, the Court hereby

adopts the Report in its entirety, and grants the Commissioner's motion. The Report is attached in its entirety at the end of this opinion. The Clerk shall close this case.

SO ORDERED.

Dated: New York, New York
January 23, 2007

Richard J. Holwell
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
FELIX ROMAN,

                              04 Civ. 4515(RJH)(DFE)

                 Plaintiff,

                              <u>REPORT AND RECOMMENDATION</u>
     - against -                <u>TO JUDGE HOLWELL</u>

JO ANNE B. BARNHART,
Commissioner of Social Security,

                        Defendant.
----------------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

      On January 29, 2001, plaintiff Felix Roman filed an application for Supplemental Security Income ("SSI") benefits (Tr. 57-60),[1] alleging that he has been unable to work since 1996 because he suffers from human immunodeficiency virus ("HIV"), chronic pain, insomnia, and a learning disability. (Tr. 57, 71.) His application was denied. (Tr. 25-28.) Plaintiff then requested a hearing by an Administrative Law Judge ("ALJ"). (Tr. 29-30.) A hearing was scheduled for May 6, 2002. (Tr. 40-45.) However, the hearing was postponed due to plaintiff's incarceration (from October 12, 2001 through April 17, 2003) for Burglary in the 3rd Degree. (Tr. 46, 153, 177, 237; New York State Department of Correctional Services Inmate Information.) On August 20, 2003, he appeared <u>pro</u> <u>se</u> for a hearing before ALJ Kenneth G. Levin. Dr. Jay Kislak,[2] an infectious disease specialist, and Melissa Fass-Karlin, a vocational expert, were present throughout the hearing, and they testified briefly at the end. (Tr. 11, 237-258.)

      On September 23, 2003, ALJ Levin issued an "unfavorable" decision to the plaintiff. (Tr. 8-18) The ALJ determined that plaintiff was not eligible for SSI benefits because he "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of this decision." (Tr. 17.) Plaintiff pursued an administrative appeal of the ALJ's decision.

---

      [1]     References to the administrative record will be cited as "Tr. __".

      [2]     The Tr. says Kislate, but plaintiff's brief and the Government's reply brief spell his name as "Kislak."

(Tr. 7.)  On March 10, 2004, the Appeals Council denied his request for review and stated that the ALJ's decision stands as the Commissioner's final decision.  (Tr. 4-6.)

On May 11, 2004, plaintiff filed a pro se complaint with our Court's Pro Se office.  On October 21, 2004, Judge Holwell referred the case to me to write a Report and Recommendation.  On January 11, 2005, the Commissioner served her answer and a copy of the administrative record.  On April 22, 2005, the Commissioner moved for an order affirming her decision.  On May 31, 2005, attorney Christopher James Bowes from the Center for Disability Advocacy Rights, Inc. ("CEDAR") filed a motion for remand on plaintiff's behalf; his brief annexed three medical reports made after the Commissioner's final decision.  On June 14, 2005, the Commissioner filed a reply memorandum opposing remand.

For the reasons discussed below, I find substantial evidence in the record to support the ALJ's decision.

BACKGROUND

Plaintiff's Personal History

Felix Roman was born on January 21, 1961.  (Tr. 57.)  He is 5'6" tall and weighs 190 pounds.  (Tr. 241.)  He has either a ninth or tenth grade education.  He says that because of his dyslexia, he reads English with "difficulty" and writes only "a little" in English.  (Tr. 70, 77, 90, 243.)  He smokes at least 1/3 to 1 pack of cigarettes a day.  (Tr. 105, 118.)

In October 1991, plaintiff was incarcerated for First Degree Assault and for Attempted Robbery in the Second Degree.  He was paroled on June 4, 1993.  (See New York State Department of Correctional Services Inmate Information.)  In 1992, he tested positive for HIV.  (Tr. 105, 118.)  He was treated for syphilis in 1984, which was apparently cured (Tr. 149), and he has survived both a stabbing and multiple gunshot wounds.  (Tr. 105, 118, 140.)

Sometime prior to June 1999, plaintiff worked in the packing and shipping departments of two factories.  (Tr. 80-87.)  From June 1999 through October 13, 1999, [3] he worked as a dishwasher

---

[3]     He may have only worked until September 1999.  His October 10, 2000 medical records state that he was incarcerated from September 1999 through March 2000.  (Tr. 105.)

for Buffalo State College's Dining Services.  (Tr. 80-87.)  From
August 30, 2000 until September 25, 2000, he worked as a cook and
a cleaner at a Kentucky Fried Chicken ("KFC") establishment.
(Tr. 80-87, 89, 251-52.)  He gave two reasons for leaving KFC.
His first reason was because of his impending "[i]ncarceration
[on] 11/25/00."  (Tr. 89.)  As his second reason, he said that
"most of my quit[t]ing had to do with my being to[o] ill to work
and to[o] embarrassed to tell any one there for fear of
discrimination!"  (Tr. 89.)  (I note that plaintiff told the ALJ
that, in the past 15 years, the only job he held was the KFC cook
position.  See Tr. 244.)

     From October 12, 2001 through April 17, 2003, plaintiff was
incarcerated again.  (Tr. 46, 153, 177, 251; New York State
Department of Correctional Services Inmate Information.)  On
October 19, 2001, plaintiff was given "work classification/mess
hall clearance" with a "limitation."  (Tr. 180.)  On October 10,
2002, the Washington Correctional Facility Medical Department
approved his clearance to work in the mess hall.  (Tr. 203.)  It
is not clear whether the October 10 clearance placed any
limitations on plaintiff's ability to work.  (Tr. 203.))  On
March 5, 2003, his prison doctor wrote that plaintiff "<u>likes to
stay busy working</u>."  (Tr. 151, with my emphasis.)

     At the time plaintiff filed his application for benefits, he
was living in Buffalo, New York with his wife and children.  (Tr.
58, 88.)  At some point after October 2001, plaintiff became
divorced.  After his April 2003 release from prison, he moved to
New York City to live with his mother.  (Tr. 241.)  Plaintiff and
his mother live in a third floor walk-up apartment.  (Tr. 242.)
Plaintiff does the grocery shopping, helps his mother get out of
bed, and sometimes cleans the house and washes their clothes.
(Tr. 242.)

     Plaintiff travels by public transportation, mainly buses.
(Tr. 243.)  He can walk about one or two blocks before he gets
tired or his legs hurt or his asthma kicks in.  (Tr. 248.)  He
can stand for about "an hour or ½ an hour," and he does not have
any limitations with respect to sitting.  (Tr. 249.)  He can also
lift and carry about 50 pounds.  (Tr. 249.)  Plaintiff testified
that he spends a "normal day" laying down and sleeping, going to
drug treatment programs, and going to his parole officer.  (Tr.
250-51.)  He constantly sees his two sisters; he says that "when
they call me out the window I come down and then we stand for
about ½ an hour, maybe 45 minutes and I'm back upstairs again."
(Tr. 252.)  He does not have any friends because his old friends
are involved in "all kinds of wrong things."  (Tr. 252.)  He
enjoys fixing things around the house and attends church (by bus)

-3-

three times a week.  (Tr. 253.)

Plaintiff testified that he cannot work because he gets
dizzy, constant diarrhea, headaches, nausea and drowsy from his
HIV medication.  However, he did not consistently take the
medicines, and he has given inconsistent information to both his
care givers and to the Social Security Administration about his
use of medications.  For instance, his November 10, 2000 and
January 4, 2001 Evergreen Health Services ("EHS") records say
that, "[h]e has not had any meds since March 2000" and that EHS
restarted him on them in January 2001.  (Tr. 105, 119, 124, 129.)
On May 14, 2001, in his request to the SSA for a hearing,
plaintiff wrote that he was taking the HIV medications.  (Tr.
96.)  However, his April 2, 2001 medical records state that he
made "a conscious decision at times not to take the medications
even though he does verbalize an understanding of the importance
of medication adherence" (Tr. 96), and his May 16, 2001 records
say:

> He has not been taking his antiretroviral
> medications since his last visit here in
> April.  Actually he stopped the medications
> the last week in March.  The patient says
> this was a faith decision.  He believes that
> this was influenced by religion and that a
> higher power has cured him and he did not
> need the medications.  His wife also, at the
> same time, made the same decision.  So, they
> have both been off their medications.

(Tr. 129.)

Nor did plaintiff take his HIV medications during his
October 12, 2001 through April 17, 2003 incarceration.  Plaintiff
claims that he kept asking for the medicine, but that the medical
staff only gave him Tylenol.  (Tr. 253-54.)  However, the medical
records during his incarceration state that he refused to take
his HIV medications.  (Tr. 178.)  He started taking the HIV
medications in May 2003, approximately three months before the
hearing.  (Tr. 246, 250.)

Plaintiff testified that after he started taking the
antiretroviral medicine in May 2003, he started suffering from
dizziness, diarrhea, headaches and nausea.  (Tr. 244-45.)  On the
other hand, he testified that, during the prior 18 months, he had
almost daily dizziness and headaches from _not_ having the
medication.  (Tr. 246-47.)  He also testified that his headaches
may have been caused "about nine years ago," when he passed out

-4-

in the shower and banged his head against the toilet. (Tr. 247-48.)

With respect to asthma, he testified that he gets attacks "once in a while," and that he has not used his pump "for a long time." (Tr. 248.) Plaintiff did not discuss his learning disorders during the hearing.

Reports from Treating Physicians
(including Prison Physicians)

From November 10, 2000 through September 13, 2001, plaintiff was treated at Evergreen Health Services in Buffalo, New York. (Tr. 104-138.)

On November 10, 2000, plaintiff complained of heartburn, frequent headaches, joint pain, leg pain and back pain. He weighed 177 pounds and measured 5'6" tall. Blood tests revealed that plaintiff had a viral load of 7,779 and a CD4 count of 367. [4] He exercised by walking and bike riding. (Tr. 105, 116-17, 138.)

Plaintiff's January 4, 2001 medical records indicate that: (1) he has no history of any AIDS defining illness or condition; (2) his weight remained at 177 pounds; (3) he had full range of motion in all extremities, and his muscle strength was within normal limits; (4) he had mild thrush [5] on his tongue and the right buccal mucosa; (5) he was diagnosed as having HIV, chronic

---

[4] "Viral load" measures HIV replication in the body. T-helper lymphocyte ("CD4") cells help the body fight off infection and disease. CD4 cell counts in someone with a healthy immune system range from 500 to 1800. When the CD4 count falls below 200, the person has AIDS. There is usually a correlation between the CD4 count and the viral load; if there is a low CD4 count, then there will be a high viral load. A low baseline viral load is considered 500 or less; a high baseline viral load is over 40,000. See "Living With AIDS", a booklet produced by the National Center for HIV, STD and TB Prevention which is available online at WWW.CDC.GOV/HIV/PUBS/BROCHURE/LIVINGWITHHIV.HTM; "AIDS 101: Guide to HIV Basics," which is available at WWW.SFAF.ORG/AIDS101.

[5] "Thrush" is the development of creamy, white, slightly elevated plaques which may be stripped off from the surface of tissue, leaving a raw bleeding surface. Dorland's Illustrated Medical Dictionary, at 1719 (27th ed. 1988).

-5-

dyspepsia (most likely gastroesophageal reflux disease ("GERD")), chronic joint and back pains due to his history of multiple traumas, and chronic frontal headaches and near-syncopal episodes. The following medications were prescribed: (a) HIV antiretroviral medications (Combivir and Viracept) for his HIV; (b) Prilosec for his GERD; (c) Diflucan for his thrush; (d) Elavil and Naprosyn for chronic pain and sleep problems. The records also state that plaintiff denied using any drugs or alcohol, but that he did smoke ½ to 1 pack of cigarettes a day. (Tr. 118-20.)

Plaintiff's February 6, 2001 records report that: (1) he was taking the antiretroviral medications without problems or side effects; (2) his GERD symptoms had been relieved by Prilosec; (3) Naprosyn and Elavil relieved his chronic pain; (4) he has a history of depression but was not receiving any counseling for it; (5) he does not have a history of any AIDS defining illness, although he did have thrush in January, which did not improve much with the Diflucan; (6) he did not have any syncopal (fainting) episodes and that his headaches decreased in severity and frequency; and (7) his weight increased by 13 pounds to 190 pounds. (Tr. 124-25.) Blood tests revealed that plaintiff had a viral load of 1,788 and a CD4 count of 412. (Tr. 128-29, 138.)

Plaintiff's April 2, 2001 records report that he was taking his antiretroviral medications, but that he "makes a conscious decision at times not to take [his HIV] medications. . . ." The records show that he complained of epigastric (stomach) discomfort with GERD symptoms, but denied having nausea, vomiting, diarrhea or constipation. They also say that he complained of chronic joint pain that was not responding to Naprosyn. Upon physical examination, he did not have thrush or lesions, and his skin did not have any rashes. He weighed 190 pounds. He was advised to stop taking Naprosyn and to use Celebrex instead. His Prilosec dosage was increased. (Tr. 129.)

Plaintiff's May 16, 2001 records state that he stopped taking his antiretroviral medications the last week in March, 2001, due to his belief that "a higher power has cured him." He had oral thrush and GERD symptoms. Plaintiff's Elavil dose was increased and he was strongly advised to go to the GI clinic for his GERD symptoms. (Tr. 132.) Blood tests revealed that plaintiff had a viral load of 11,455 and a CD4 count of 266. (Tr. 138.)

Plaintiff's June 28, 2001 records report that he did not have any skin rashes, oral thrush, nausea, vomiting or diarrhea. He was told that he could restart the antiretroviral medications

and switch back to Naprosyn.  (Tr. 134.)

Plaintiff's August 21, 2001 records report that he resumed taking his antiretroviral medications, without any missed doses or side effects.  He did not have nausea, vomiting or diarrhea, but he did complain of chronic back pain.  A physical examination revealed that he had full range of motion of his lumbar spine, although he complained of discomfort at the extremes.  He had some oral thrush but no skin rashes or lesions.  (Tr. 135.) Blood tests revealed that plaintiff had a viral load of 997 and a CD4 count of 267.  (Tr. 138.)

Plaintiff's September 13, 2001 records report that his weight increased to 207 pounds.  He did not have nausea, vomiting or diarrhea.  Nor did he have cervical or axilary lymphadenopathy (disease of the lymph nodes).  He did not have any skin rashes, but he did have some oral thrush.  He was advised to temporarily stop taking his antiretroviral medications until test results could determine whether he had any mutations that showed resistance to the medications; his last genotype showed some resistence to Epivir and Nefinavir, but not to the AZT.  (Tr. 136.)  Blood tests revealed that plaintiff had a viral load of 8,285.  (Tr. 138.)

During the period of October 2001 through April 2003, plaintiff's health was monitored by Department of Correctional Services medical providers.  (Tr. 149-209.)

Plaintiff's October 11, 2001 medical records state that he refused to take his HIV medications.  (Tr. 178.)  On October 16, 2001, new antiretroviral medications were prescribed.

Plaintiff's November 13, 2001 records state that he "has not taken any [of his antiretroviral medications] since 11/9."  (Tr. 155.)  His November 26, 2001 records report that he has a "history of non-compliance with HIV meds."  (Tr. 157.)  The November 26 records further say that plaintiff "need[s] ARV [antiretroviral] tx [treatment] but want[s] to start when sx [symptom] free."  (Tr. 158.)  It was also reported that he did not have thrush.  (Tr. 157.)

Plaintiff's December 3, 2001 records state that he "is resistant to 3TC and NLV so he has leeway from treatment perspective."  Blood tests revealed that his viral load was 5,000 and that his CD4 count was 265.  He did not have any symptoms or history of opportunistic infections.  (Tr. 159.)

Plaintiff's March 18, 2002 records say that he: (1) "feels

-7-

well"; (2) does not have thrush; (3) does not want treatment "at present"; and (4) was either told to stop smoking or stopped smoking. Blood tests revealed that plaintiff had a viral load of 7,000 and a CD4 count of 308. (Tr. 160.)

Plaintiff's May 13, 2002 records state that there was no evidence of thrush. (Tr. 161.) His June 3, 2002 records state that he passed out while working. (Tr. 161.)

Plaintiff's June 24, 2002 records show that his viral load on that date was 5,700 and his CD4 count was 308. He again refused treatment for HIV, but was noted to be "stable" and did not have thrush. (Tr. 162.)

Plaintiff's September 24, 2002 records state that: (1) his HIV was "stable"; (2) there was "no dramatic" change in CD4 or viral load; (3) he did not have thrush; (4) he feels well; and (5) he is a non smoker (but that was while he was in prison). (Tr. 164.)

Plaintiff's October 7 and 10, 2002 records say that his HIV was "stable." His September 2002 lab work revealed that his viral load was 5,190 and that his CD4 count was 248. (Tr. 166.) He was approved to work in the mess hall. (Tr. 203.)

Plaintiff's November 5, 2002 records state that he was "doing well" and "feeling well" on no HIV medication. They also say that he had symptomatic GERD. (Tr. 170.)

Blood tests conducted on December 13, 2002 revealed that plaintiff's viral load was 4,800 and his CD4 count was 138. (Tr. 172, 205.) Undated records citing the December 13 tests state that plaintiff's intravenous drug use put him at risk. (Tr. 205.)

Plaintiff's March 4 and 7, 2003 records note that he was still not taking any HIV medication at that time. They further say that he "is at high risk for AIDS related illness due to low CD4 count." (Tr. 173.) Medical records dated March 5, 2003 state that the only opportunistic infection plaintiff had was oral thrush. (Tr. 150.) Moreover, plaintiff denied a history of drug use. (Tr. 150.) It was reported that his behavioral status was appropriate and that he "likes to stay busy working." (Tr. 151.)

By March 19, 2003, plaintiff's viral load had increased to 12,884 and his CD4 count had increased to 162. (Tr. 174.) His March 25 records say that he had "advanced AIDS" and was at "high

risk of opportunistic infections." Plaintiff agreed to seek treatment at Bellevue Hospital upon his April 17, 2003 release. (Tr. 176.)

On April 24, 2003, plaintiff started HIV treatment at Bellevue Hospital. (Tr. 210-236.) Blood tests conducted on that day showed that his CD4 count was 140. (Tr. 213.)

Plaintiff was seen for the first time at Bellevue's clinic on May 9, 2003. He had no complaints, "no pain issues at this time," and felt "well." (Tr. 216-17.) He denied intravenous drug and alcohol use. (Tr. 216.) His physical exam was normal. (Tr. 217.) Blood tests conducted on that day revealed that his CD4 count was 138. (Tr. 223.)

Plaintiff's May 19, 2003 records state that he was "well" with no complaints and "no pain issues at this time." He was prescribed HIV medications. (Tr. 225.)

Plaintiff's June 19, 2003 records also report that he had "no pain issues at this time." (Tr. 227.) June 19 blood tests revealed that his CD4 count had increased to 196. (Tr. 230.)

On July 25, 2003, Marie Antoine Cameau, a physician assistant, reported that: (1) plaintiff had "no history of psychiatric disorders"; (2) plaintiff had "normal mood, no evidence of thought disturbance"; (3) plaintiff's July 17 physical examination was normal; (4) plaintiff "has been doing well on new antiretroviral regimen"; (5) plaintiff "recently started Nexium for GERD with relief of symptoms"; and (6) plaintiff has had "no recent asthma exacerbations." (Tr. 232-35.)

### Reports from Consulting Physicians

On March 15, 2001, Dr. C. Gowda, a consulting physician, examined plaintiff. (Tr. 139-143A.) Plaintiff complained of severe headaches, generalized body pain, dizziness, and occasional blackouts, but he did not complain of nausea, vomiting, blurred vision or aura. (Tr. 139.) Plaintiff denied using alcohol or drugs. He reported that he quit smoking "about a year back," but I note that his January 4, 2001 medical records say that he smokes ½ to 1 pack of cigarettes a day. (Tr. 139, 118.)

Upon examination, Dr. Gowda found normal range of motion in plaintiff's back and neck, as well as normal posture and gait. No joint abnormalities were noted, and plaintiff's chest x-ray

was normal. Dr. Gowda diagnosed chronic headaches, generalized
lumbar radiculopathy (disease of the nerve roots) and dizziness.
Dr. Gowda further stated that plaintiff's prognosis was guarded
due to multiple medical problems. However, in Dr. Gowda's
opinion, plaintiff "can do some occupation without any physical
limitations." (Tr. 140-43A.)

### New Medical Reports Submitted on May 31, 2005

Annexed to Attorney Bowes's motion for remand are: (1) a
March 15, 2004 letter from Beata Jackowska, a
psychotherapist/counselor at St. Mark's Place Institute for
Mental Health, Inc. ("St. Mark's"); (2) an October 14, 2004
Functional Capacity Questionnaire for Psychiatric Disorders
signed by a Dr. B. Bukholtz of St. Marks; and (3) an October 14,
2004 Assessment of Functional Limitations Resulting from a
Mental/Intellectual Impairment signed by Dr. Bukholtz. I will
now summarize each of these documents. The problem is that these
reports are dated long after ALJ Levin's decision, although the
first report does mention a course of treatment that began in May
2003 -- three months before the hearing and four months before
the ALJ's decision.

### 1. Ms. Jackowska's March 15, 2004 letter

This letter states that plaintiff has been attending the St.
Mark's clinic for psycho education, anger management and relapse
prevention since May 14, 2003. The letter says that plaintiff
"remains sober since admission, reports sobriety since 1985." It
also says (with my emphasis in bold):

> Mr. Roman has **good attendance** and fully
> participates in his treatment. . . .

> Mr. Roman is **unable to work at present moment**
> and needs treatment for a long duration.

| Axis I: | Marijuana Dep. in full, sustain[ed] remission |
| --- | --- |
| | Mood D/O (disorder) due to medical condition |
| | R/O (rule out) Major Depressive D/O, recurrent, Severe |

        \*    \*    \*

| Axis III: | HIV(+), Migraine headaches, |
| --- | --- |

-10-

Chronic Arthritis

Axis IV:       Problems with primary social support

Axis V:        Moderate impairment in social occupational functioning

Medications:   none, psychotherapy recommended, compliant.

2.    Dr. Bukholtz's October 14, 2004 Functional Capacity Questionnaire for Psychiatric Disorders

Dr. Bukholtz writes that:

Axis I:        Marijuana Dep. in full remission

Mood D/O [disorder] due to med[ical] con[dition]

R/O [rule out] MDD [Major Depressive Disorder], recurrent, moderate

\*     \*     \*

Axis III:     HIV(+), Chronic Arthritis

Axis IV:      [illegible] financial difficulties

Axis V:        Moderate impairment in social occupational functioning GAF 40-31

Dr. Bukholtz reports plaintiff's symptoms as "dysphoric [restlessness], depressed, tense, depressed, sad, apathetic, anxious mood, increased irritability, [and] situational anxiety." Dr. Bukholtz says that:

(1) plaintiff can travel alone by bus and by subway;

(2) plaintiff has moderate [6] limitations with respect to restrictions of daily living activities, maintaining social functioning and concentrating;

(3) with respect to plaintiff's ability to work on a

---

[6]    A "moderate" impairment is defined as one which affects, but does not preclude, the ability to function. A "marked" impairment is defined as one which seriously affects the ability to function.

-11-

regular and continuous basis, he has moderate limitations
regarding his abilities to: (a) understand, remember and carry
out instructions, (b) respond appropriately to co-workers, and
(c) perform simple tasks on a sustained basis in a full-time work
setting;

(4) with respect to plaintiff's ability to work on a regular
and continuous basis, plaintiff has marked limitations in his
ability to: (a) respond appropriately to supervision, (b) satisfy
an employer's normal quality, production and attendance
standards, and (c) perform complex tasks on a sustained basis in
a full-time work setting;

(5) with respect to plaintiff's ability to work on a regular
and continuous basis, plaintiff has mild limitation on his
ability to respond to customary work pressures;

(6) plaintiff has problems dealing with authority figures
and his anxiety increases under pressure.

       3.   <u>Dr. Bukholtz's October 14, 2004</u>
           <u>Assessment of Functional Limitations</u>
           <u>Resulting from a Mental/Intellectual Impairment</u>

Along with his answers to the questionnaire, Dr. Bukholtz
submitted a letter stating as follows.  Plaintiff can take care
of his daily needs.  With respect to a work environment, however,
plaintiff will be impaired due to an "increase of anxiety in
social setting" and an "increase of irritability in response to
supervisor."  Moreover, in a work environment, plaintiff will
have difficulties: (1) showing consideration for others; (2)
displaying awareness of other feelings; (3) exhibiting social
maturity; (4) responding to those in authority; (5) establishing
interpersonal relationships; (6) persisting in tasks; (7)
assuming increased mental demands associated with competitive
work; (8) holding a job; (9) maintaining regular attendance and
being punctual within customary tolerance; (10) working with or
near others without being unduly distracted; (11) performing at a
consistent pace without an unreasonable number and length of rest
periods; (12) being able to accept instructions from supervisors;
and (13) responding appropriately to criticism from supervisors.
Dr. Bukholtz says he expects plaintiff's impairments to last for
more than 12 months.  Dr. Bukholtz's findings are supported by a
Mental Status Examination, and by clinical observation during
group and individual interactions.  On the other hand, I note
that his prediction about difficulties in "maintaining regular
attendance" is contradicted by Ms. Jackowska's report that "Mr.
Roman has good attendance and fully participates in his

treatment."

## DISCUSSION

In evaluating a disability claim, the Social Security regulations require the Commissioner, through the ALJ, to apply a five-step process:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), quoting Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (my emphasis added).

At Step One, ALJ Levin properly found that plaintiff has not engaged in substantial gainful activity since the alleged onset of "disability." (Tr. 16.)

At Steps Two and Three, ALJ Levin correctly found that:

2. The claimant has a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically-determinable impairments do not

-13-

meet or medically equal one of the listed impairments
in Appendix 1, Subpart P, Regulation No. 4.

(Tr. 16.)

At Tr. 15-16, ALJ Levin wrote:

I find that Dr. Kislak's assessment is more than
fair in this case.  Though claimant did have some
complaints of dizziness and headaches before he filed
his application and for a short period thereafter, they
ceased over two years ago.  (In any case, no disease
was ever found to explain them anyway.)  Since then, he
has been pretty much asymptomatic, though he has had a
depressed viral load from his HIV disease (a situation
likely to correct itself now that he is back on
HAARTs). . . . .

I agree with Dr. Kislak that claimant's only
obviously "severe" impairment is HIV disease.  His GERD
is controlled on medication.  He carries a diagnosis of
asthma, but it plainly has been quite inactive in
recent years, and if it is "severe" it is only very
marginally so.  I do not find that he has any of the
other symptoms of which he complained except for
perhaps some fatigability, and further note that some
of his complaints could not even reasonably be
attributed to any proven medically-determinable
impairment.

(Tr. 16.)  The ALJ also found that plaintiff's allegations
regarding his limitations were not totally credible, and that his
subjective complaints were not documented in any of his recent
records.  (Tr. 15-16.)  I find that the ALJ was in the best
position to evaluate plaintiff's credibility.

Pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.08, a
person is considered disabled with HIV infection if there is
documentation of such infection and one of the following
conditions exists (with my emphasis added) [7]:

A. Bacterial infections:
*     *     *
4. <u>Syphilis</u> or neurosyphilis--evaluate

_____

[7]     I list only those sections which are applicable to
plaintiff's condition.

-14-

sequelae under the criteria for the affected
body system (e.g., 2.00 Special Senses and
Speech, 4.00 Cardiovascular System, 11.00
Neurological); or
      *    *    *
I. <u>HIV wasting syndrome</u>, characterized by
<u>involuntary weight loss</u> of 10 percent or more
of baseline (or other significant involuntary
weight loss, as described in 14.00D2) and, in
the absence of a concurrent illness that
could explain the findings, either:

1. <u>Chronic diarrhea</u> with two or more loose
stools daily lasting for 1 month or longer;
      *    *    *
J. <u>Diarrhea</u>, lasting for 1 month or longer,
resistant to treatment, and <u>requiring
intravenous hydration, intravenous
alimentation, or tube feeding</u>.
      *    *    *
N. Repeated (as defined in 14.00D8)
manifestations of HIV infection (including
those listed in 14.08A-M, but without the
requisite findings, e.g., carcinoma of the
cervix not meeting the criteria in 14.08E,
<u>diarrhea</u> not meeting the criteria in 14.08J,
or other manifestations, e.g., oral hairy
leukoplakia, myositis) resulting in
significant, documented symptoms or signs
(e.g., fatigue, fever, malaise, weight loss,
pain, night sweats) and <u>one</u> of the following
at the marked level (as defined in 14.00D8):

1. Restriction of activities of daily living;
or

2. Difficulties in maintaining social
functioning; or

3. Difficulties in completing tasks in a
timely manner due to deficiencies in
concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.08 (with my emphasis
underlined).

    Upon my review of the evidence, I agree with the ALJ's
finding that plaintiff's impairments fail to satisfy the § 14.08

criteria.  Plaintiff's syphilis has been anergic (inactive) for a
number of years.  See Tr. 149, 232.  Nor did plaintiff have HIV
wasting syndrome during the time in question.  (Tr. 265.)  He did
not lose a substantial amount of weight, and his complaints of
"chronic" diarrhea and nausea did not necessitate the use of
intravenous hydration, intravenous alimentation, or tube feeding.
(Contrary to plaintiff's position, the medical records show that
those conditions were not "chronic," but were instead isolated
incidents.  See Tr. 129, 134-36.)  Moreover, the fact that
plaintiff's CD4 counts have declined at times to less than 200 is
irrelevant at this juncture.  The low CD4 counts have led to an
opportunistic disease, but the medical records show that he did
not have any.  Indeed, his July 25, 2003 records said, "Patient
has been doing well on new antiretroviral regimen," and his CD4
count showed an increase.  (Tr. 235.)

    With respect to Steps 4 and 5 of the five-step process, ALJ
Levin consulted with Dr. Kislak, [8] an infectious disease
specialist, and with Melissa Fass-Karlin, a vocational expert.
The ALJ determined that plaintiff could not return to his past
relevant work.  He also found that plaintiff had the residual
functional capacity to perform a "significant range of light
work" as long as he avoided very strong environmental irritants.
He gave, as examples of work that plaintiff could perform:
cashier, counter attendant, order clerk, and charge account
clerk.  (Tr. 17.)

    Plaintiff's memorandum, at pages 7-8, argues that the ALJ
erroneously discounted plaintiff's complaints of nausea and
diarrhea.  Those complaints had not lasted for 12 months as of
the September 2003 decision.  (Tr. 13.)  But plaintiff's
memorandum quotes 42 U.S.C. § 423(d)(1)(A) and argues that the
ALJ should have considered whether those complaints "can be
_expected_ to last for a continuous period of not less than 12
months."  With respect to this argument, I again find that the
ALJ was in the best position to judge plaintiff's credibility
with respect to these complaints.  This is especially true in
light of the fact that none of plaintiff's medical records show
that he complained of nausea or diarrhea.  (Tr. 105, 118-20, 124-
25, 129, 131, 132, 134, 135, 136, 139, 149-52, 154-79, 180-81,
205, 216-17, 225, 227, 232-35.)

    Plaintiff's memorandum, at pages 8-9, argues that the ALJ

---

    [8]    Under 20 CFR 416.927(f), the ALJ may rely on Dr.
Kislak's opinion, even though Dr. Kislak did not physically
examine plaintiff.

failed to consider his complaints of modest fatigue with respect
to Steps 4 and 5. However, it is clear from Dr. Kislak's
testimony that he took plaintiff's fatigue into consideration
when he determined that plaintiff could perform "sedentary to
light" work. (Tr. 255-56.) It is also clear from the ALJ's
opinion that he considered Dr. Kislak's opinion, as well as
plaintiff's testimony, with respect to his Step 4 and Step 5
findings; the ALJ wrote:

> In Dr. Kislak's further opinion, claimant's HIV
> disease might be expected to have a modest effect on
> his ability to exert himself. However, he would not be
> expected to have difficulty with either sedentary or
> light exertional activity.
>
> I find that Dr. Kislak's assessment is more than
> fair in this case. . . . Somewhat contradictorily,
> claimant asserted severe limitations on walking and
> standing, but hardly any on lifting and carrying. Even
> he admitted that he could do sedentary work activity.
> His attempt to portray himself as almost completely
> dysfunctional contrasted with the various activities he
> gradually admitted to doing on a regular basis. His
> doctors - even those from very recent times - consider
> him to be doing well. Mr. Roman himself told his
> doctors recently that he had no complaints and was
> feeling well. I find that his credibility is very
> seriously in question on a record like this one.

(Tr. 16.) Once again, I defer to the ALJ's findings with respect
to plaintiff's credibility.

Plaintiff's memorandum, at page 8, complains that "ALJ Levin
failed to include 'modest fatigue' in his questioning of
vocational expert Melissa Fass." But Ms. Fass-Karlin was sitting
in the room throughout the hearing. (Tr. 17, 240.) Presumably,
she heard Dr. Kislak's testimony regarding plaintiff's residual
functional limitation of "modest fatigue." (Tr. 255.) In any
event, pursuant to 20 C.F.R., Part 404, Subpart P, Appendix 2, a
"younger individual between the ages of 18 and 44" with a
"limited" education and no transferable skills from any past
relevant work, is "not disabled" under either the "sedentary"
work table (Table No. 1) or the "light" work table (Table No. 2).
(See Tr. 17.) Moreover, under 20 C.F.R. § 404.1567(b) and §
416.967(b), if an individual has been found to have the ability
to perform light work, he automatically has the ability to
perform sedentary work. In the case at bar, plaintiff himself
admitted to having the abilities to perform sedentary work. (Tr.

249.)  Therefore, assuming arguendo that the ALJ was incorrect
when he found that plaintiff had the residual functional capacity
to do light work, SSI benefits would still be denied because he
had the capacity to do sedentary work.

### Plaintiff's Post-Decision Evidence

In his motion papers at Exhibit A, plaintiff submits post-
decision evidence consisting of the three reports described above
at pages 10-12.  These new reports show that since May 14, 2003,
plaintiff has been attending the St. Mark's clinic for a
marijuana dependency problem and for a psychological disorder.
The reports state the authors' findings with respect to
plaintiff's ability to work; Ms. Jackowska writes that plaintiff
"is unable to work at present moment," and Dr. Bukholtz writes
that plaintiff has both moderate and marked impairments that will
affect his ability to work.  Plaintiff argues that a remand is
justified because: (1) the new evidence is material, and (2) he
had good cause for not submitting the records to the ALJ before
the ALJ issued his opinion, namely that the records did not then
exist.  (Pl. Memo. pp. 9-11.)  Plaintiff's memorandum, at pages
10-11, argues that one report is "particularly probative" because
it says that, as of October 2004, plaintiff's Global Assessment
of Function score was "50-41" (more commonly written as 41 to
50).  It cites four cases saying that a GAF score below 50 is
generally incompatible with the ability to work.  But that score
was dated 13 months after ALJ Levin's decision.

Pursuant to 42 U.S.C. § 405(g), a court "may at any time
order additional evidence to be taken before the Commissioner of
Social Security, but only upon a showing that there is new
evidence which is material and that there is good cause for the
failure to incorporate such evidence into the record in a prior
proceeding. . ."  To satisfy these requirements, plaintiff must
show that: (1) the evidence is new and not merely cumulative of
what is already in the record; (2) the evidence is material; and
(3) good cause existed for his failure to present this evidence
earlier.  *Lisa v. Secretary of Dept. of Health and Human
Services.*, 940 F.2d 40, 43 (2d Cir. 1991), *quoting Tirado v.
Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  To be material, the
evidence must be "both relevant to the claimant's condition
during the time period for which benefits were denied, and
probative."  *Id*. (with my emphasis).  In addition, "[t]he concept
of materiality requires. . . a reasonable possibility that the
new evidence would have influenced the Secretary to decide
claimant's application differently."  *Id*.  "'Good cause' for
failing to present evidence in a prior proceeding exists where
the evidence surfaces after the Commissioner's final decision and

the claimant could not have obtained the evidence during the pendency of that proceeding." *Lisa*, 940 F.2d at 44.

For the following reasons, I find that plaintiff failed to satisfy the requirements of § 405(g) with respect to Dr. Bukholtz's and Ms. Jackowska's records.

<u>First</u>. Although Dr. Bukholtz's report notes both moderate and marked impairments that would affect plaintiff's ability to work, it was based on an <u>October 6, 2004</u> mental status examination.

<u>Second</u>. Ms. Jackowska's letter says that plaintiff "is unable to work at [the] <u>present</u> moment [i.e., March 15, 2004] . . ." (with my emphasis).

<u>Third</u>. Plaintiff's February 6, 2001 medical records show that plaintiff had a history of depression but was not receiving counseling "at this point." (Tr. 124.) With the exception of Ms. Jackowska and Dr. Bukholtz, none of plaintiff's other medical providers noted any treatment for depression during the period in question, namely January 29, 2001 (the day plaintiff applied for benefits) to September 23, 2003 (the day ALJ Levin issued his decision). The Appeals Council adopted the ALJ's decision as its final decision on March 10, 2004.

<u>Fourth</u>. Ms. Jackowska and Dr. Bukholtz write that plaintiff started treatment with them on May 13, 2003. However, Marie Antoine-Cameau, a physician assistant at Bellevue who first examined plaintiff on May 9, 2003, reported on July 25, 2003, that plaintiff had "no history of psychiatric disorders." She also reported that, as of July 17, 2003, plaintiff's mood was normal with no evidence of thought disturbance. (Tr. 232-33.) (The hearing before the ALJ was held on August 20, 2003.)

<u>Fifth</u>. The contemporaneous records kept by plaintiff's treating medical providers show that, during the time in question, plaintiff was not suffering from a mental impairment that would affect his ability to work. On March 5, 2003, the prison medical records said that plaintiff's behavioral status was "appropriate" and that he "likes to stay busy working." (Tr. 151.)

<u>Sixth</u>. Dr. Bukholtz writes that plaintiff is taking Remeron for his mental impairment. Dr. Bukholtz does not say when Remeron was first prescribed, but the evidence tends to show that it was prescribed after the ALJ's September 2003 decision. Remeron was not on the list of "Claimant's Medications," which

was prepared sometime after May 9, 2003.  (Tr. 236.)  Moreover,
Ms. Jackowska's March 15, 2004 letter does not mention that
plaintiff was taking Remeron.

        Courts in this circuit have held that an ALJ "has a duty to
adequately protect a pro se claimant's rights 'by ensuring that
all of the relevant facts [are] sufficiently developed and
considered.'"  *Abreu v. Apfel*, 1999 WL 244105, at *3 (S.D.N.Y.
Apr. 26, 1999) (Sand, J.), *quoting, Cruz v. Sullivan*, 912 F.2d 8,
11 (2d Cir. 1990) (internal citation omitted).  In the case at
bar, the ALJ questioned plaintiff about the two programs he
attended at St. Marks.  (Tr. 250-51.)  Plaintiff stated that they
were both drug programs.  (Ibid.)  He did not mention that he was
being treated for depression.

        Under 42 U.S.C. § 423(d)(2)(C), "[a]n individual shall not
be considered disabled . . . if alcoholism or drug addiction
would . . . be a contributing factor material to the
Commissioner's determination that the individual is disabled."

        Accordingly, I find that plaintiff has failed to show that
Dr. Bukholtz's and Ms. Jackowska's reports meet the requirements
laid out in 42 U.S.C. § 405(g).

                    CONCLUSION AND RECOMMENDATION

        The Commissioner's decision may be reversed only if it is
based on legal error or if it is not supported by substantial
evidence.  *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).
I find that there is substantial evidence in the record to
support the ALJ's findings, and I also conclude that he did not
commit any legal errors.  Accordingly, I recommend that Judge
Holwell grant the Commissioner's motion for judgment on the
pleadings and deny plaintiff's motion for a remand.

        Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the
Federal Rules of Civil Procedure, any party may object to this
recommendation within 10 business days after being served with a
copy (i.e. by September 2, 2005,) by filing written objections
with the Clerk of the U.S. District Court and mailing copies (a)
to the opposing party, (b) to the Hon. Richard J. Holwell,
U.S.D.J. at Room 1950, 500 Pearl Street, New York, NY 10007 and
(c) to me at Room 1360, 500 Pearl Street.  Failure to file
objections within 10 business days will preclude appellate
review.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary
of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per
curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e).
Any request for an extension of time must be addressed to the

District Judge.

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181

Dated:      New York, New York
            August 16, 2005

Copies of this Report and Recommendation were sent by mail on
this date to:

Christopher James Bowes, Esq.
CEDAR, Inc.
841 Broadway, Suite 605
New York, New York 10003

Lorraine S. Novinski, Esq.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

Hon. Richard J. Holwell